UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD JEFFREY KINT,

                    Petitioner,

v.                                        CASE NO. 08-CV-10789-DT
                                          HONORABLE AVERN COHN
SHERRY BURT,

                    Respondent.

_____/

**MEMORANDUM AND ORDER**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS**
**AND**
**DENYING A CERTIFICATE OF APPEALABILITY**

I.  Introduction

This is a habeas corpus case under 28 U.S.C. § 2254.  Petitioner Richard Jeffrey

Kint is challenging his state conviction and sentence for arson of a dwelling.  For the

reasons that follow, Petitioner is not entitled to habeas relief.  Accordingly, the petition

will be denied.

II.  Background

A.  The Trial Testimony, Verdict, and Sentence

Petitioner was charged in Jackson County, Michigan with burning his and his

wife's house.  He was living alone in the house at the time because his estranged wife,

Lyna Kint, had filed for divorce and moved out of the marital home.[1]  On the day of the

_____

        [1]  By the time Ms. Kint testified at trial, she had remarried and taken the last
name of Henman.  For the sake of consistency, the Court will refer to her as Lyna Kint
or Ms. Kint.

fire, Petitioner called Ms. Kint and left a message for her, stating that, by the time she received his message, he and the house would be gone. The house, in fact, was on fire when Ms. Kint received Petitioner's message. The police found Petitioner lying outside the house with a rifle nearby. He had moved the couple's pets and some of his own possessions out of the house. He informed one of the responding officers that he had tried to shoot himself in the head and missed. He was unharmed, but it was determined that he should go to the hospital for an evaluation. Before he got into an ambulance that arrived at the scene, he turned around, saw the house engulfed in flames, and said, "Oh, my God, what did I do?" He began to cry, and when a police officer asked Petitioner, "Did you do that?," he responded, "Yes." Petitioner later admitted to police officers that he probably started the fire.

A fire investigator for the Michigan State Police determined that there were no accidental reasons for the fire. The investigator opined at trial that someone intentionally poured gasoline on the basement floor of the house and ignited it.

The prosecutor's theory was that Petitioner set the house on fire because he was angry at his wife for seeking a divorce and for depriving him of financial support. Petitioner did not testify or present any witnesses. His defense was that he lacked the necessary intent, mental capacity, or state of mind to be found guilty of arson.

On August 12, 2003, a Jackson County jury found Petitioner guilty, as charged, of arson of a dwelling, Mich. Comp. Laws. § 750.72. The trial court sentenced Petitioner to imprisonment for five to twenty years, with 403 days of jail credit, and restitution in the amount of $237,340.94.

B.  The Appeals and Habeas Petitions

Petitioner raised his first four habeas claims in an appeal of right.  The Michigan Court of Appeals affirmed his conviction and sentence in an unpublished, per curiam opinion.  See People v. Kint, No. 251147 (Mich. Ct. App. Feb. 15, 2005).  Petitioner raised the same issues and two new issues regarding appellate counsel and the sentencing guidelines in the Michigan Supreme Court.  On October 13, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  See People v. Kint, 704 N.W.2d 466 (2005) (table).

Petitioner then raised all six claims in a federal habeas corpus petition.  Another judge in this district dismissed the petition without prejudice because Petitioner had failed to raise his claims about appellate counsel and the sentencing guidelines in the Michigan Court of Appeals.  See Kint v. Burt, No. 05-CV-74822-DT (E.D. Mich. Mar. 9, 2007).

Meanwhile, in 2006, Petitioner filed a motion for relief from judgment in the trial court.  He claimed that (1) his appellate attorney was ineffective, (2) the sentencing guidelines were mis-scored, (3) the trial court erred in departing from the sentencing guidelines, (4) the jury instructions were inadequate, and (5) his confession should not have been used at trial.  The trial court denied Petitioner's motion after concluding that there was absolutely no basis for granting relief from judgment.  The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal the trial court's decision on the ground that Petitioner failed to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D).  See People v. Kint, No. 275874 (Mich. Ct. App. June 18, 2007); People v. Kint, 742 N.W.2d 610 (2007) (table).

3

In 2007, Petitioner challenged his sentence in another motion for relief from judgment. The trial court denied his motion, and the Michigan Court of Appeals dismissed Petitioner's appeal for lack of jurisdiction. <u>See</u> <u>People v. Kint</u>, No. 280016 (Mich. Ct. App. Sept. 7, 2007). Petitioner did not appeal that decision to the Michigan Supreme Court.

In 2008, Petitioner filed a motion for correction of records. The trial court dismissed Petitioner's motion, and the Michigan Court of Appeals dismissed Petitioner's subsequent appeal for lack of jurisdiction. <u>See</u> <u>People v. Kint</u>, No. 287853 (Mich. Ct. App. Oct. 15, 2008). The Michigan Supreme Court denied leave to appeal because Petitioner's motion was prohibited by Michigan Court Rule 6.502(G). <u>See</u> <u>People v. Kint</u>, 769 N.W.2d 232 (2009) (table).

Petitioner filed his habeas corpus petition on February 26, 2008. His first claim challenges the trial court's denial of his request for appointment of substitute counsel. Claims two, three, four, six, and seven challenge Petitioner's sentence, and claims five and ten allege ineffective assistance of counsel. Claim eight challenges the trial court's jury instructions, and claim nine alleges that Petitioner's confession was involuntary. Although Respondent maintains that some of these claims are procedurally defaulted, the Court has opted to address the merits of Petitioner's claims.

III. Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, habeas petitioners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits–

(1) resulted in a decision that was contrary to, or involved an

4

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

IV.  Discussion

A.  Substitution of Counsel

Petitioner claims that the trial court abused its discretion and deprived him of his right to effective assistance of counsel by denying his requests for appointment of substitute counsel without holding a hearing on the issue.  The Michigan Court of Appeals stated on review of this claim that Petitioner's requests were properly denied because he failed to show good cause for the substitution of counsel.  The Court

agrees.

### 1.  Clearly Established Law

A defendant in a criminal case has a right to the assistance of counsel in his

defense.  U.S. CONST. amend. VI; Faretta v. California, 422 U.S. 806, 807 (1975).

However, "[a]n indigent defendant has no right to choose his counsel." Montejo v.

Louisiana, __ U.S. __, __, 129 S. Ct. 2079, 2084 (2009).

> When an accused seeks substitution of counsel in mid-trial, he must show
> good cause such as a conflict of interest, a complete breakdown in
> communication or an irreconcilable conflict with his attorney in order to
> warrant substitution.
>
> Consideration of such motions requires a balancing of the
> accused's right to counsel of his choice and the public's interest in the
> prompt and efficient administration of justice.

Wilson v. Mintzes, 761 F.2d 275, 280 (6th Cir. 1985) (citations omitted).

### 2.  Application

On June 9, 2003, Petitioner wrote to the trial court and complained that his trial

attorney had said there was nothing he could do for him.  Petitioner asked the trial court

for permission to have a second attorney look at his case because he did not think that

his attorney was representing him as well as he should.  Petitioner also stated that he

wanted several people to appear at his trial and that his trial attorney informed him that

there was no reason to subpoena the witnesses.  The trial court responded to

Petitioner's note, saying, "No new attorney.  Jury trial set for June 23, 2003 @ 8:30 a.m.

Be ready."

On June 11, 2003, Petitioner sent another note to the trial court.  He stated that

his trial attorney had not given him copies of police reports, doctors' reports, or his

telephone bill. The trial court responded that the county had already paid for defense counsel's copies and that Petitioner should consult with his attorney.

Petitioner sent a third note to the trial court on June 18, 2003. He asked to have his case re-scheduled because he had not talked to his trial attorney about the case and his witnesses had not been notified. The trial court responded that trial was set for June 23, 2003.

These notes demonstrate that Petitioner was frustrated with his trial attorney and the progress of his case. However, his trial did not commence until August 11, 2003, and Petitioner expressed no dissatisfaction with his attorney during trial.

Furthermore, it appears that Petitioner's frustration stemmed in large part from the lack of a viable defense. He had made admissions to the police, and a mental health professional had found him criminally responsible for the crime. Petitioner's comment to the trial court – that his trial attorney had said there was nothing he could do for Petitioner – may have been triggered by trial counsel's letter to Petitioner on April 6, 2003. In that letter, trial counsel informed Petitioner that, without an insanity defense, Petitioner basically had no defense. See Habeas Pet., Ex. A.

There is no evidence of an irreconcilable conflict or a complete breakdown in communication between Petitioner and his attorney immediately before or during trial, and the trial court was not required to hold a hearing on Petitioner's request for substitution of counsel. Wilson v. Parker, 515 F.3d 682, 696 (6th Cir. 2008), cert. denied, __ U.S. __, 130 S. Ct. 113 (2009). Petitioner's mere frustration and impatience did not constitute compelling circumstances justifying substitution of counsel. And because Petitioner was not prevented from receiving an adequate defense, the state

appellate court's finding of insufficient cause for substitution of counsel did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is therefore not entitled to relief on this claim.

## B. Petitioner's Confession

Petitioner claims that he was not in any condition to be making statements to the police because he was heavily medicated and not in a normal state of mind when he was interviewed by the police while hospitalized after the fire. Petitioner also claims that there was no attorney present during the interrogations. He therefore argues that his statements were not freely and voluntarily made.

The trial court held a hearing on this issue and determined that Petitioner was properly advised of his constitutional rights and that his statement was voluntarily made and admissible at trial.[2] The trial court re-visited the issue when ruling on Petitioner's first motion for relief from judgment. The trial court found that Petitioner had submitted nothing credible to refute the court's prior holding.

## 1. Clearly Established Federal Law

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the [Supreme] Court established in Miranda [v. Arizona, 384 U.S. 436 (1966)] 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" Florida v.

---

[2] This hearing apparently was never transcribed and is not a part of the record before the Court.

8

Powell, __ U.S. __, __, 130 S. Ct. 1195, 1203 (2010) (quoting Duckworth v. Eagan, 492 U.S. 195, 201 (1989)). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444. If at any stage of the process, the suspect indicates that he wishes to consult with an attorney before speaking or that he does not want to be interrogated, the police may not question him. Id. at 444-45. On the other hand, if a suspect voluntarily, knowingly and intelligently waives his Miranda rights, any incriminating responses to questioning may be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding. Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990).

The test for voluntariness of a confession is whether ""the confession [was] the product of an essentially free and unconstrained choice by its maker[.] If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'" Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). A reviewing court must evaluate all the circumstances of the interrogation to determine whether law enforcement officials overbore the will of the accused such that the suspect's statements were not the product of his free and rational choice. Mincey v. Arizona, 437 U.S. 385, 401-02 (1978).

2. Application

The record indicates that Michigan State Trooper Gina Gettel interviewed

Petitioner at Foote Hospital in Jackson, Michigan early on August 5, 2002, while Petitioner was still in the emergency room. He had not been treated yet, according to Trooper Gettel. She read Petitioner's constitutional rights to him, and he agreed to speak with her. When Trooper Gettel asked Petitioner how the fire started, Petitioner responded that it was probably him, but that he was not sure how the fire started because he was the only person at the house and he did not remember anything after the fire. Petitioner explained to Trooper Gettel that he had been upset with his wife because she would not return his telephone calls. Petitioner also informed Trooper Gettel that he had taken some prescription medication and drank some alcohol earlier that day. Medical tests, however, failed to show the presence of alcohol or drugs in Petitioner's body. The interview with Trooper Gettel terminated when Petitioner could not remember anything more and did not want to continue talking. Trooper Gettel then petitioned to have Petitioner hospitalized.

Petitioner was subsequently transferred to a psychiatric unit at Chelsea Community Hospital. On August 5, 2002, state trooper Jack Hooker and Sergeant Byrne interviewed Petitioner in the presence of a hospital employee. Trooper Hooker advised Petitioner of his constitutional rights, and Petitioner agreed to talk with the officers. Petitioner admitted that he probably lit the house on fire, but that he did not remember doing it. He stated that he was taking medication at the hospital, but he did not think it was affecting him. Trooper Hooker testified at trial that he also did not think Petitioner's medication affected his conversation with Petitioner.

Dr. Kenneth L. Moss interviewed Petitioner at the hospital on August 5, 2002, the same day that Trooper Hooker and Sergeant Byrne interrogated Petitioner. Dr. Moss

diagnosed Petitioner with major depression and stated that, although Petitioner was mentally ill and required treatment, he had no psychotic symptoms. Dr. Moss described Petitioner as "alert, lucid, and oriented to person, place, and time." On the following day, Dr. Moss reported that Petitioner was oriented to person, place, and time. No delusions were apparent, and associations were intact. Petitioner denied experiencing side effects from the medications, and he stated that he intended to cooperate with the police regarding the investigation of the fire. Dr. Moss had the impression that the medications were well tolerated. <u>See</u> Habeas Pet., Ex. 6.

Several days later, on August 13, 2002, Trooper Gettel went to see Petitioner at Chelsea Community Hospital because Petitioner had contacted her about finishing their earlier interview. Trooper Getttel took a written statement from Petitioner after first reading his constitutional rights to him. Petitioner agreed to talk with her, and, although there was some medication on a nearby table, Petitioner was coherent and cooperative. He appeared to understand the conversation, and he responded appropriately.

The foregoing evidence illustrates the lack of credible evidence of incompetence at the time Petitioner made his statements to the police. Although he was hospitalized and apparently was taking medication, there is no indication that his medication impaired his capacity for self-determination. Ms. Kint, in fact, testified at trial that Petitioner tolerated medications very well and that he had told her so. (Tr. Aug. 11, 2003, at 166, 178-79.) Furthermore, Petitioner was advised of his constitutional rights before being interrogated and, by all accounts, he waived his rights. He has not alleged that he requested an attorney and was denied one, and he has not complained that the police coerced him into making a statement. His suicidal ideation and mental condition

were insufficient to render his statements involuntary, absent any police coercion.

United States v. Cody, 498 F.3d 582, 588 (6th Cir. 2007) (quoting Colorado v. Connelly,

479 U.S. 157, 164 (1986)).  The Court therefore concludes that Petitioner's statements

to the police were voluntary and knowing.

### 3.  Harmless Error

"[T]he admission of an 'involuntary' confession at trial is subject to harmless error

analysis," Arizona v. Fulminante, 499 U.S. 279, 303 (1991), and a constitutional error is

harmless unless it had a substantial and injurious effect or influence on the jury's

verdict.  Brecht v. Abrahamson, 570 U.S. 619, 623 (1993).

> If the court is certain that the error had no or a small effect, the error is
> harmless; when, in contrast, "a federal judge in a habeas proceeding is in
> grave doubt about whether a trial error of federal law had 'substantial and
> injurious effect or influence in determining the jury's verdict,' that error is
> not harmless.  And, the petitioner must win." O'Neal v. McAninch, 513
> U.S. 432, 436 (1995).

Tolliver v. Sheets, 594 F.3d 900, 924 (6th Cir. 2010).

Even if Petitioner's custodial statements to the police were erroneously admitted

in evidence, the constitutional error had little or no effect on the jury's verdict, given the

other evidence against Petitioner.  Ms. Kint testified that shortly before the fire,

Petitioner left a message on her cell phone, stating that he had moved her animals to

the pole barn and that, by the time she received his message, both he and the house

would be gone.  (Tr. Aug. 11, 2003, at 150.)  Police Officer Debbie Ambs spoke with

Petitioner outside the house while the house was still burning.  As the two of them

walked to the ambulance, which was waiting to take Petitioner to the hospital, Petitioner

saw the house engulfed in flames and said, "Oh, my God, what did I do?"  Officer Ambs

then asked Petitioner, "Did you do that?"  Petitioner responded, "Yes."  (Tr. Aug. 11, 2003, at 108.)  In light of these pre-arrest comments, Petitioner's subsequent comments to police officers in the hospital could not have had a substantial and injurious effect or influence on the jury's verdict and were harmless.

Overall, Petitioner is not entitled to habeas relief on his claim regarding his confession.

### C.  The Jury Instructions

Petitioner challenges the trial court's jury instructions on the ground that the trial court instructed the jury that arson is a general intent crime.  Petitioner claims that the crime is a specific intent crime.

The Michigan Supreme Court has held that "common-law arson is a general intent crime that merely requires the prosecutor to prove malice."  People v. Nowack, 614 N.W.2d 78, 79 (2000).  The state court's interpretation of state law is binding on the Court.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005).  Petitioner therefore has no right to relief on the basis of his claim that the trial court should have instructed the jury that arson is a specific intent crime.  As such, this claim must be denied.

### D.  The Sentencing Claims

Petitioner's second, third, fourth, sixth, and seventh habeas claims challenge Petitioner's sentence of five to twenty years.  Petitioner claims that the trial court erred when scoring Offense Variables 4 and13 of the Michigan sentencing guidelines.  Petitioner further alleges that the trial court erroneously departed from the sentencing guidelines and abused its discretion by sentencing him to a minimum of five years in prison when the guideline range was twenty-one to thirty-five months.

Petitioner is not entitled to habeas relief on these claims because a state court's interpretation and application of state sentencing guidelines is a matter of state concern only, Howard v. White, 76 Fed. Appx. 52, 53 (6th Cir. 2003), and "[a] federal court may not issue the writ on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984).

The fourth claim, however, claims a violation of the Sixth Amendment right to a jury trial. This constitutional claim lacks merit. Petitioner bases his claim on Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004). The Supreme Court held in Apprendi that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. In Blakely, the Court stated that the "statutory maximum" for purposes of Apprendi "is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303 (emphasis omitted).

"Apprendi's rule does not apply to judicial factfinding that increases a minimum sentence so long as the sentence does not exceed the applicable statutory maximum." Chontos v. Berghuis, 585 F.3d 1000, 1002 (6th Cir. 2009). In Michigan, the maximum sentence for arson of a dwelling is twenty years. See MICH. COMP. LAWS § 750.72. Petitioner's sentence of five to twenty years did not exceed the statutory maximum. Consequently, his sentence survives Sixth Amendment scrutiny.

E. Trial Counsel

Petitioner claims that his trial attorney's omissions amounted to ineffective

assistance of counsel.[3]  To show a violation of the Sixth Amendment right to effective

assistance of counsel, a petitioner must establish that his attorney's performance was

deficient and that the deficient performance prejudiced the defense.  Strickland v.

Washington, 466 U.S. 668, 687 (1984).  An attorney's performance is deficient if

"counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment" or if  "counsel's representation fell

below an objective standard of reasonableness."  Id. at 687-88.

An attorney's deficient performance is prejudicial if "counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at

687.  The defendant must show "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the

outcome."  Id. at 694.

An attorney's "strategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation.  In other words, counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations

unnecessary."  Strickland, 466 U.S. at 690-91.  "The focus in failure-to-investigate

---

[3] Respondent argues that this claim is procedurally defaulted because Petitioner
did not raise the claim in state court and no longer has an available remedy.  The Court
disagrees.  Petitioner raised his ineffectiveness claim in a motion to file an additional
issue during his second round of appeals.  The Michigan Court of Appeals granted
leave to raise the issue, but ultimately denied Petitioner's application for leave to
appeal.  Petitioner raised his claim about trial counsel in the Michigan Supreme Court
as well.

claims, then, is the reasonableness of the investigation (or lack thereof)." English v. Romanowski, 602 F.3d 714, 726 (6th Cir. 2010) (citing Wiggins v. Smith, 539 U.S. 510, 527 (2003)).

### 1. Failure to Prepare an Insanity Defense

Petitioner says that his trial counsel should have prepared and presented an insanity defense or at least fully investigated Petitioner's mental health issues. In Michigan, "[l]egal insanity is an affirmative defense requiring proof that, as a result of mental illness or being mentally retarded as defined in the mental health code, the defendant lacked 'substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or conform his or her conduct to the requirements of the law.'" People v. Carpenter, 627 N.W.2d 276, 280 (2001) (quoting Mich. Comp. Laws § 768.21a(1)). The Mental Health Code defines "mental illness" as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." Mich. Comp. Laws § 330.1400(g).

As noted above, Dr. Kenneth L. Moss interviewed Petitioner at the Chelsea Community Hospital on August 5, 2002, the day after the fire for which Petitioner was charged. Dr. Moss stated in a report on his interview with Petitioner that Petitioner was mentally ill and required treatment for depression, but that he was lucid, oriented, and had no psychotic symptoms. On the following day, Dr. Moss observed Petitioner and found him to be oriented to person, place, and time with no delusions.

On January 7, 2003, Petitioner was evaluated for criminal responsibility. The licensed psychologist who interviewed Petitioner stated in a written report that Petitioner

had completed a psychological questionnaire, but that his responses yielded an invalid profile, which could not be clinically interpreted. The source of the invalidity appeared to be a strong tendency to exaggerate symptoms. The psychologist went on to say in her report that, although Petitioner had a history of depression and substance abuse, he was not mentally retarded, and his depression did not meet the statutory definition of mental illness. The psychologist concluded that Petitioner was not legally insane at the time of the offense.

Petitioner's trial counsel subsequently requested appointment of an independent clinician for a second evaluation of Petitioner's sanity. See Habeas Pet., Ex. A. It appears that counsel's request was granted and that the second evaluation also resulted in the conclusion that Petitioner was not insane at the time of the offense.

In light of these facts, trial counsel appears to have made a reasonable strategic decision that Petitioner did have a viable insanity defense and that further investigation into Petitioner's mental health issues was unnecessary. Ms. Lint, in fact, testified at trial that Petitioner knew exactly what reality was, but that he wanted to portray himself in such a way that people felt sorry for him or elevated his status. (Tr. Aug. 11, 2003, at 174.) Thus, trial counsel was not ineffective for failing to raise an insanity defense.

### 2. Failure to Call Witnesses

Petitioner also claims that his trial counsel was ineffective for failing to subpoena and call witnesses for the defense. Petitioner informed the trial court before trial that he wanted to call Lyna Kint, Bobby King, Susan Foster, Holly Bolka, Dorthy Swihart, Lynett Boyers, Roney Goldsmith, Larry Piloski, Nora Lee Wright, Beckie Mitchell, and doctors at St. Joe's and Chelsea Hospitals. See Habeas Pet., Ex. A.

17

The prosecution called Ms. Kint as a witness, and trial counsel had an opportunity to cross-examine her. As for the doctors, trial counsel indicated at the beginning of trial that he had sent subpoenas to Dr. Jennifer Kelso and to Dr. Kenneth Moss and that he was trying to contact them. He anticipated having them available on the following day. (Tr. Aug. 11, 2003, at 6-7.) The doctors did not testify, but their clinical certificates and summaries were admitted in evidence as substitutes for their testimony. A pathology and laboratory report dated August 4, 2902, also was admitted in evidence. Thus, trial counsel was not ineffective in failing to call Ms. Kint or any of the doctors.

Petitioner has not explained who the other prospective witnesses were or what they would have said had they testified. As such, the Court finds that, even if trial counsel's performance was deficient, the deficient performance did not prejudice the defense.

### 3. Failure to Communicate a Plea Offer

Petitioner's third and final claims about his trial counsel alleges that the attorney failed to notify him of a plea offer. Petitioner says that he would have accepted the offer because it called for the dismissal of two unrelated assault charges and a minimum sentence of twenty months in prison, less time served.

While it is true that "a defense attorney's failure to communicate a plea offer to his or her client constitutes deficient performance," Guerrero v. United States, 383 F.3d 409, 416 (6th Cir. 2004), there is no evidence in the record that trial counsel failed to notify Petitioner of a plea offer. Trial counsel stated in a letter to Petitioner on April 6, 2003 (four months before trial) that the prosecution had not offered Petitioner a charge

reduction or a sentence agreement.  <u>See</u> Habeas Pet., Ex. A.

Petitioner supports his claim with affidavits from Ronald G. Goldsmith and Chris
Goldsmith.  Both affidavits are dated September 22, 2005.  They state that Petitioner's
trial counsel informed them that the prosecutor offered to drop two counts of
escape/assault and to request a sentence of twenty months if Petitioner pleaded guilty
to arson.  Both affidavits go on to say that Petitioner did not accept the offer.  <u>See</u>
Habeas Pet., Ex. 14.  Even if the affidavits are accepted as true and accurate, they do
not support Petitioner's argument that his attorney withheld a plea offer.  In fact, the
affidavits imply that trial counsel did inform Petitioner of a plea offer, because they state
that Petitioner did not accept the offer.

None of Petitioner's claims about trial counsel meet the <u>Strickland</u> standard of
deficient performance and resulting prejudice.  Thus, Petitioner is not entitled to habeas
relief on the basis of his claim about trial counsel.

### F.  Appellate Counsel

Petitioner claims that appellate counsel was ineffective for failing to raise habeas
claims six through ten in the appeal of right.  Claim seven alleges that the trial court
departed from the sentencing guidelines on the basis of characteristics already taken
into account in determining the appropriate sentencing range.  Petitioner's appellate
counsel made this argument in the appeal of right.  Thus, there is no factual support for
Petitioner's claim that appellate counsel failed to raise claim seven on appeal.

Appellate counsel was not required to advance other nonfrivolous claims
requested by Petitioner.  <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983).  To prevail on his
claim, Petitioner must show that his attorney's performance was deficient and that the

deficient performance prejudiced the defense.  <u>Strickland</u>, 466 U.S. at 687.[4]  The

"deficient performance" prong requires showing that appellate counsel made an

objectively unreasonable decision not to raise claims six, eight, nine, and ten.  In other

words, Petitioner must show that those claims are clearly stronger than the issues

counsel did present to the Michigan Court of Appeals.  <u>Thompson v. Warden, Belmont</u>

<u>Corr. Inst</u>., 598 F.3d 281, 285 (6th Cir. 2010).  To demonstrate prejudice, Petitioner

must show a reasonable probability that, but for his attorney's unreasonable failure to

raise certain claims in the appeal of right, he would have prevailed.  <u>Id</u>.

1.  Failure to Raise the Eighth, Ninth, and Tenth Claims

The Court has already determined that claim eight (inadequate jury instructions),

claim nine (involuntary confession), and claim ten (ineffective assistance of trial

counsel) lack merit.  Therefore, appellate counsel's decision not to raise those issues on

direct appeal can be considered sound appellate strategy.

2.  Failure to Raise the Sixth Claim

Claim six alleges that the trial court erroneously used public safety issues to

score Offense Variable 13, which measures whether there was a "continuing pattern of

criminal behavior."  Mich. Comp. Laws § 777.43(1).  Petitioner was scored twenty-five

points, which is appropriate if "[t]he offense was part of a pattern of felonious criminal

activity involving 3 or more crimes against a person."  Mich.  Comp. Laws §

---

[4]  This standard applies to claims about appellate counsel as well as trial
counsel.  <u>Webb v. Mitchell</u>, 586 F.3d 383, 398 (6th Cir. 2009) (citing <u>Smith v. Robbins</u>,
528 U.S. 259, 285 (2000)), <u>cert. denied</u>, __ S. Ct. __, 2010 WL 637798 (U.S. Apr. 19,
2010) (No. 09-7207).

777.43(1)(c). Petitioner contends that his other crimes involved an assault on jail employees, which is a public safety crime and does not constitute "felonious criminal activity."

While it is true that assault of a correctional guard is classified as a crime against public safety, it is also a crime against a person. People v. Bonilla-Machado, No. 287605, 2009 WL 4827831, at *3 (Mich. Ct. App. Dec. 15, 2009) (unpublished). Therefore, Petitioner was properly scored twenty-five points for Offense Variable 13, and appellate counsel was not ineffective for failing to raise this issue in the appeal of right.

### 3. Failure to Raise a Claim of Incompetence

Petitioner appears to claim that appellate counsel should have questioned Petitioner's competence to stand trial. "A defendant can be adjudged competent to stand trial if he has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and [if] he has a rational as well as factual understanding of the proceedings against him.'" Eley v. Bagley, __ F.3d __, __, No. 06-4503, 2010 WL 1924479, at *5 (6th Cir. May 14, 2010) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)) (alteration added). "'[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient.'" Id. (quoting Drope v. Missouri, 420 U.S. 162, 180 (1975)).

Although Petitioner asserts that he was heavily medicated at trial, he wrote intelligible notes to the trial court a few months before trial, and the trial court stated in

its order denying Petitioner's first motion for relief from judgment that it found nothing to substantiate Petitioner's claim of incompetence at the time of trial.

Furthermore, it is clear from the record that appellate counsel made a strategic decision not to raise a claim of incompetence. In a letter to Petitioner on January 12, 2005, appellate counsel stated that there was no reasonable basis for seeking relief based on a claim that Petitioner was incompetent to stand trial. Appellate counsel gave three reasons for this conclusion: (1) the issue was waived by Petitioner's failure to raise the issue before trial; (2) there was no record support for a claim that Petitioner was not competent to stand trial, and the time for seeking a remand to make a factual record had expired; and (3) there was persuasive evidence that he was competent, for neither his trial attorney, nor two mental health professionals, gave any indication before trial that they thought Petitioner was incompetent. In a subsequent letter to Petitioner on February 2, 2005, appellate counsel repeated that he did not believe a competency claim had any merit. Counsel's failure to raise the issue on appeal was a reasonable strategic decision.

To summarize, appellate counsel did raise claim seven on appeal, and the habeas issues that counsel failed to raise on appeal would not resulted in success because they lack merit. "[A]ppellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001). Petitioner therefore has no right to relief on the basis of his claim about appellate counsel.

### V. Conclusion

For the reasons stated above, the state courts' rejection of Petitioner's claims did

not result in decisions that were contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. Accordingly, the petition for a writ of habeas corpus is **DENIED**.

Furthermore, reasonable jurists would not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. The Court therefore **DECLINES** to grant a certificate of appealability under 28 U.S.C. § 2253(c)(2).[5] See Slack v. McDaniel, 529 U.S. 473, 484 (2000). However, if Petitioner chooses to appeal the Court's decision, he may proceed in forma pauperis on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

SO ORDERED.


Dated: June 2, 2010                    _S/Avern Cohn_____
                                       AVERN COHN
                                       UNITED STATES DISTRICT JUDGE



I hereby certify that a copy of the foregoing document was mailed to Richard Kint, 467741, 2580 Litle Road, Parma, MI 49269  the attorneys of record on this date, June 2, 2010, by electronic and/or ordinary mail.


                                       _S/Julie Owens_____
                                       Case Manager, (313) 234-5160

---

[5]  Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.